1                    UNITED STATES DISTRICT COURT

2                     SOUTHERN DISTRICT OF OHIO

3                         EASTERN DIVISION

4                            -  -  -

5    INTERNATIONAL DAIRY FOODS      :
     ASSOCIATION,                   :
6                                   :
            PLAINTIFF,              :
7                                   :
        VS.                         :  CASE NO. 2:08-cv-628
8                                   :
     ROBERT J. BOGGS,               :
9    SOLELY IN HIS OFFICIAL CAPACITY :
     AS OHIO DIRECTOR OF AGRICULTURE, :
10                                  :
            DEFENDANT.              :
11                                  :
                             -  -  -
12
     ORGANIC TRADE ASSOCIATION,     :
13                                  :
            PLAINTIFF,              :
14                                  :
        VS.                         :  CASE NO. 2:08-cv-629
15                                  :
     ROBERT J. BOGGS,               :
16   IN HIS OFFICIAL CAPACITY AS    :
     OHIO DIRECTOR OF AGRICULTURE,  :
17                                  :
            DEFENDANT.              :
18                            -  -  -

19            INITIAL PRELIMINARY INJUNCTION CONFERENCE

20   BEFORE THE HONORABLE JAMES L. GRAHAM, UNITED STATES DISTRICT JUDGE,
     SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION, SITTING AT COLUMBUS,
21   OHIO, ON JULY 1, 2008.

22   APPEARANCES:

23       CHARLES J. ENGLISH, JR., ESQ.,
         CLAY HUFF, GENERAL COUNSEL,
24       JOHN MCDONALD, ESQ.,

25           ON BEHALF OF PLAINTIFF INTERNATIONAL DAIRY FOODS ASSOCIATION.

1    RANDALL J. SUNSHINE, ESQ.,
     MICHAEL J. KING, ESQ.,
2
         ON BEHALF OF PLAINTIFF ORGANIC TRADE ASSOCIATION.
3
     JAMES R. PATTERSON, ASSISTANT ATTORNEY GENERAL,
4    WILLIAM J. COLE, ASSISTANT ATTORNEY GENERAL,
     JOHN WILLIAMS, ASSISTANT ATTORNEY GENERAL,
5
         ON BEHALF OF DEFENDANT ROBERT J. BOGGS.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                          LAURA L. SAMUELS
25                   OFFICIAL FEDERAL COURT REPORTER

Tuesday Morning Session

July 1, 2008

- - -

THE COURT: Let's go around the table, and we will have all the counsel formally enter their appearances.

MR. ENGLISH: Good morning, Your Honor. My name is Charles English. I am with the law firm of Thelen, Reid, Brown, Raysman & Steiner in Washington, D.C., representing the International Dairy Foods Association, plaintiff. And I believe I have *pro hac* papers on file.

MR. HUFF: Good morning, Your Honor. My name is Clay Huff, and I am the general counsel with the International Dairy Foods Association based in Washington, D.C.

MR. MCDONALD: Good morning, Your Honor. I am John McDonald with Schottenstein, Zox & Dun. I'm here as local counsel on behalf of the Dairy Foods Association.

MR. SUNSHINE: Good morning, Your Honor, Randy Sunshine, from the law firm of Liner, Yankelevitz, Sunshine & Regenstreif in Los Angeles. I have also filed *pro hac* papers on behalf of the Organic Trade Association.

MR. KING: Good morning, Your Honor, Michael King from Dinsmore & Shohl here in Columbus, serving as local counsel with Randy Sunshine for the Organic Trade Association.

MR. WILLIAMS: Your Honor, John Williams from the Attorney General's office. My section represents Director Boggs

1    and the Department of Agriculture.

2              MR. COLE:  Your Honor, I'm Bill Cole with the Attorney

3    General's office on behalf of the Department of Agriculture and

4    Director Boggs.

5              MR. PATTERSON:  Good morning, Your Honor, Jim Patterson,

6    Assistant Attorney General, trial attorney for Director Boggs in

7    both cases that have been filed yesterday.

8              THE COURT:  Very well, thank you, counsel.

9              This is the case of International Dairy Foods Association

10   and others against Robert J. Boggs, Director of the Ohio

11   Department of Agriculture.  This case was filed in our court

12   yesterday morning with a request for a temporary restraining

13   order.  And we have a local rule that requires an initial

14   conference between the Count and counsel before the Court takes

15   any action on a request for temporary injunctive relief.  So we

16   are convened here this morning pursuant to that rule.

17             But I think this is a case in which we might expand the

18   nature of the conference perhaps to include discussion of an

19   appropriate scheduling order in this case to accomplish all of the

20   necessary preparation for a hearing.

21             As I looked over the papers, it became apparent this was

22   not a case in which there was an immediate urgency in that, as so

23   often the case, where we're confronted with having to preserve a

24   *status quo* with a deadline of a day or so.

25             I would also make the observation that this is a very

unusual application for a TRO.  I thought that lawyers felt the only time they could file an application for a TRO was on Friday afternoon.  This is certainly an exception, one of the few that I have seen filed on a Monday morning, but it's awfully nice to have the luxury of having a little more time to think about things.

MR. MCDONALD:  The clerk's office was equally pleased.

THE COURT:  No doubt.  No doubt.

Let's just have a get-acquainted sort of discussion about this case.  I have had a chance to scan some of the documents, but let's go around the table and give counsel the opportunity to tell me what they believe this case is all about.  Why don't we start with Mr. English.

MR. ENGLISH:  Thank you, Your Honor, and forgive me and maybe there is some confusion that erupted from the filing yesterday, but this is really an application for preliminary injunction.  There is actually no application for a temporary restraining order.  That may or may not be the last thing we all agree on today, but it's a preliminary injunction.

THE COURT:  Very well.

MR. ENGLISH:  I will get to the timing issue in a moment. While we don't need anything today, I think there is a real need for relief very soon.

Your Honor, this case is about the free speech rights of commercial entities both to speak to their consumers and consumers to receive speech about a technology that, while it has been

approved for 14 years, has not been without controversy.  And the

technology, what they call rbST, recombinant bovine somatotropin,

while it has been around for 14 years, there has also been

labeling around products that voluntarily speak to the concept

that various entities, such as Ben & Jerry's, do not accept milk

from dairy farmers that use rbST in the treatment of their cows.

And for 14 years --

THE COURT:  Is the purpose of it to increase milk

production?

MR. ENGLISH:  The technology's purpose is that it results

in increased milk production under certain circumstances.

THE COURT:  All right.

MR. ENGLISH:  Again, it's not without controversy.  IDFA

for its part is a supporter of the use of technologies.  That's

not the issue as far as IDFA is concerned.  The issue for IDFA is

many of its members, because of consumer demands, wished to tell

their consumers that they do not receive milk from cows that have

been treated with the technology.

And that kind of labeling issue has been around since FDA

approved the technology.  The same day they approved it, they

literally issued guidance about how one could label.  And that

labeling has grown up over 14 years with some state action but

largely the FDA guidance.

And suddenly, Ohio has stepped into this situation, first

with an emergency rule and then a rule that is effective September

1  19 of this year, and has effectively changed the landscape for all

2  of these labels.

3       The FDA guidance states that it may be important to have

4  a disclaimer if you say that you do not use rbGH or rbST.  And to

5  date, no one has said that disclaimer language must be at the same

6  level of the claim, our cows are not treated with rbST, and then

7  there is the FDA disclaimer.  In most instances, as the FDA itself

8  has indicated, that is connected by an asterisk, and it is

9  readable.

10      But Ohio has said that that disclaimer must be contiguous

11 with the claim.  They have also indicated that you cannot say, no

12 rbST, even if you similarly at the same time make the production

13 claim that, our cows are not treated with rbST, even though that

14 is also standard in the industry, has been standard now for 14

15 years.

16      But literally what has happened here, and the reason why

17 there is urgency, is that Ohio chose to say no to a number of

18 claims, even though consumers have had these claims for 14 years.

19 There have been claims of this nature in Ohio for 14 years.  Ohio

20 now claims that consumers are misled or potentially misled.

21      Our view of that is quite clear.  The First Amendment

22 says that the state may not tell us how to deliver our messages

23 that are accurate and not misleading.  The state's response to

24 that is:  We will deem certain messages to be misleading.

25      The definition of deem is to have or form an opinion.

1     But that is not what is required under the First Amendment.  What

2     is required under the First Amendment is actual evidence, not

3     speculation, that a message is misleading.

4          THE COURT:  All right.  Well, I think that's a pretty

5     good thumbnail sketch of the plaintiffs' claims.

6          Now you said something that caught my attention.  The FDA

7     has spoken on this issue of disclaimer?

8          MR. ENGLISH:  FDA expressly at the time that rbGH/rbST

9     was approved indicated that they recognized both consumers would

10    want to know and some entities would wish to speak about the fact

11    that their milk may not be treated.

12         But at the same time FDA said, in order to avoid

13    potential misleading, we suggest that one provide the following

14    disclaimer, that there is no significant difference been shown

15    between cows treated with rbST and those cows that have not been

16    treated with rbST.

17         But subsequent to that, a year later, when asked by New

18    York, FDA says, we have never said that statement is mandatory.

19    There are circumstances in which a claim of no use of rbST would

20    not be misleading without the statement.  So it's not even, in our

21    view, a mandatory statement.

22         And now Ohio is saying, not only are we going to make it

23    mandatory, we are going to tell you where to put it.  We're going

24    to tell you what size it should be in.  We're going to tell you

25    what color it should be --

1       THE COURT:  Now I noticed in reviewing the papers that

2    have been filed a reference to a federal -- I don't know whether

3    this would be correct to call it a federal code, but a federal

4    framework of statutory regulations for organic food products.

5       MR. ENGLISH:  And I would hand off to Mr. Sunshine for

6    that, Your Honor.

7       THE COURT:  All right.  Mr. Sunshine, tell me about that

8    and how that relates to this case.

9       MR. SUNSHINE:  Thank you, Your Honor.  We are a little

10    bit different from Mr. English's client, which is the nonorganic

11    industry, in that the organic industry since 1990 has been

12    regulated by an act called the Organic Foods Production Act.  And

13    then subsequently that series of 600 or so regulations, known as

14    the National Organic Program, all of which are designed to

15    regulate the organic industry on the federal level -- what the

16    brief history is that the organic industry had been regulated on a

17    piecemeal basis throughout the country by states.  It didn't work.

18    There needed to be standards, federal standards, or Congress

19    decided there needed to be federal standards, and those were

20    passed, like I said, in 1990 with regulations to follow.

21       So for a number of years the organic industry has been

22    regulated carefully, aggressively, systematically by the federal

23    government.  In order to be labeled organic, you must go through a

24    careful accreditation and certification process, constant

25    regulation by the federal government --

1          THE COURT:  Does this Organic Foods Production Act

2     include labeling?

3          MR. SUNSHINE:  Yes.

4          THE COURT:  Does it specifically include ingredients

5     labeling?

6          MR. SUNSHINE:  Yes, absolutely it does.  Yes, it does.

7          THE COURT:  Does it address the issue of labeling of milk

8     with respect to these substances that Mr. English just told us

9     about?

10         MR. SUNSHINE:  Well, we believe at least by implication

11     it does, if not expressly, because, very simply, in order to be

12     labeled organic, you must go through this accreditation process

13     which includes not being able to use rbST.  You can't use rbST for

14     it to be labeled organic.  So the fact that you are labeled

15     organic is --

16         THE COURT:  So the use of rbST is mentioned in the

17     federal act or regulations?

18         MR. SUNSHINE:  Yes, added artificial hormones and, I

19     believe, rbST itself.

20         THE COURT:  Does the federal act or any of its

21     regulations specifically deal with product claims and advertising?

22         MR. SUNSHINE:  The act deals with labeling.  And it does

23     regulate how the organic industry labels.

24         THE COURT:  All right.

25         MR. SUNSHINE:  So our main argument -- our first argument

1    in our papers, for example, is preemption, federal preemption.  We

2    are already regulated by the federal government.  And implicitly

3    in the statute, the statute is designed to prevent states like

4    Ohio from taking these extra measures to try to regulate organics

5    when we are already regulated by the federal government.

6            THE COURT:  All right.

7            MR. SUNSHINE:  And furthermore, we also have the same

8    First Amendment argument certainly that Mr. English does, as well

9    as, I'm not sure he mentioned, the commerce clause argument, but

10   it is also a fundamental Constitutional right that we feel is

11   being violated by requiring different labeling in Ohio from states

12   surrounding.

13           THE COURT:  Have any other states gotten into this issue

14   of labeling with these substances?

15           MR. ENGLISH:  Yes, Your Honor.  From day one a number of

16   states got involved, some states on the exact opposite side here,

17   that is to say Vermont was the first state, and it had two pieces

18   to its original legislation.  One piece is what's in effect today,

19   which expressly permits voluntary claims of the nature that are on

20   the labels that Ohio says you may not make.  For instance, no

21   rbST, our cows are not treated with, that's expressly in the

22   Vermont statute, also expressly in Minnesota and Wisconsin.

23   Alaska also has a provision, and Maine has the Maine real seal

24   that is based on the same concept.

25           Vermont went a step further.  Vermont said, if your milk

comes from cows treated with rbST, we are going to require you, the milk processor, to label that your milk has come from cows treated with rbST.

And the International Dairy Association filed a lawsuit on First Amendment grounds, among others, against Vermont and prevailed before the Second Circuit on that issue, that they were being forced to speak. And we submit that this case, that's the *IDFA versus Amestoy* case in our papers, we submit that this case is virtually identical to this case in that our members are being forced to say the disclaimer in the way that the state declares.

Now after that, Your Honor, Illinois entered the realm to some extent, and it banned labeling. It was sued by Ben & Jerry's, Whole Foods and others. The case settled relatively quickly with an issuance of an Illinois regulation which is not as restrictive as the Ohio regulation. It is identical in one respect on its face, that it bans claims of no rbST; but in practice it has not actually banned that claim, and we have that in our declaration, Shamrock declaration, that in fact the no rbST claim was permitted by Illinois.

Most recently -- There are a number of states that are looking at this. I mean, frankly, Your Honor, what this gets to is, the unstate of the clear purpose here, is to protect rbGH producers and the company that makes rbGH, Monsanto Company, from competition from non-rbGH which is not a legitimate state interest.

1      A number of states have been looking at the issue over
2   the last twelve months for the reason that critical mass has been
3   achieved.  Consumer demands are such that the product is just not
4   welcome to consumers.  And a number of processors declared that
5   they have to have their milk from cows not treated with rbST.
6   That was February 1.  The director's emergency rule was February
7   8.
8      In the interim, Pennsylvania issued an absolute ban
9   October 29 of last year, I believe it was, certainly late October,
10  IDFA and others, frankly, threatened suit, ultimately resolved the
11  matter with Pennsylvania.  Pennsylvania withdrew their ban and
12  ended up with a provision which is now being applied, and how it's
13  being applied may be a different issue, but on its face is less
14  restrictive than the Ohio provision.  In fact, Pennsylvania would
15  permit a claim of no rbST, our cows are not treated with rbST,
16  from a plant located in Erie, Pennsylvania.  But if this product
17  comes into Ohio after September 19, it would be banned.  And at
18  some point I would like to talk about the timing issue here.
19     So, yes, a lot of states have acted.  But the general
20  issue over 14 years has been to permit, not restrict, the product.
21     THE COURT:  Have the plaintiffs in this case had the
22  opportunity to have input with the Ohio Department of Agriculture
23  and/or negotiations with the Ohio Department of Agriculture about
24  the rule?
25     MR. ENGLISH:  After the emergency rule was issued, a lot

1   of people reacted.  The director, quite properly -- and we

2   appreciate the fact -- had two hearings in March and April.  The

3   transcripts are part -- the largest part of the volume of the

4   exhibits, 250 pages or so.  And the International Dairy Foods

5   Association, from that part -- Mr. Sunshine can speak to OTA --

6   had an opportunity to speak.

7           A number of the arguments that are made in our papers

8   today are not surprising because they were found in that material.

9   Very, very small changes were made in the emergency rule, but it

10  did not affect its overall impact.  But, yes, there was an

11  opportunity to be heard.  IDFA was heard, although we don't

12  believe we were really heard in the sense that action was taken on

13  that.

14          And part of that concern that IDFA has is even before the

15  emergency rule, Ohio had in existence authority to act about any

16  misleading labels.  There is existing authority under the federal

17  standards, which is the FDA guidance, to act.

18          We are unaware of any significant effort undertaken --

19  First of all, we are unaware of consumer complaints that preceded

20  the emergency rule.  We are unaware of enforcement attempted under

21  the existing regulations.  And we are unaware of ineffective

22  enforcement.  So then why we are suddenly having this?

23          THE COURT:  All right.  Mr. Sunshine, do you want to add

24  anything --

25          MR. SUNSHINE:  Only that we also participated in -- We

testified at the hearing.  We have had informal discussions, my
client has had informal discussions, with Mr. Patterson.  So we
have attempted to discuss the issues with the state.  They have
not, obviously, resulted in a result that we're comfortable with.

THE COURT:  Well, let's hear the other side's story.

MR. PATTERSON:  Thank you, Your Honor.  I will try to
give you a brief rundown, more or less, in a chronological time
frame here of what took place.

First, with regard to the FDA guidance which was in place
in the 1990s, the FDA guidance is, by its very terms, guidance.
It's voluntary guidelines.  But the guidance from FDA does
specifically make mention of the fact that FDA is relying upon the
states to enforce any laws with regard to misleading claims on
labels.

So not only is there no preemption on the part of FDA on
this issue, but in fact the opposite, the explicit reliance on the
states to act within their own borders.  The language which ODA
ultimately adopted is virtually the same as the federal suggested
language in the FDA guidance.

With regard to the Organic Foods Production Act, which
was also mentioned a few minutes ago, that has been on the books
for a while.  I respectfully disagree with plaintiffs' counsel in
saying that there is any preemption in the federal act with regard
to these labels.  The Organic Foods Production Act deals
specifically with the basis for which one may use the term

1    "organic."  All of the terms reference what needs to be done in

2    order to qualify either under a USDA-approved program or a

3    state-approved program that meets USDA guidelines to use that term

4    "organic."

5         There is no provision in the Organic Foods Production Act

6    that in any way impedes or preempts state regulation of other

7    label claims that may be misleading, such as the one that's the

8    subject of this rule.  So ODA would disagree that there is any

9    basis for preemption because of the OFPA with regard to the rule

10   that's in dispute in both of these cases.

11        When this issue became, I guess the way to put it, an

12   important issue within the industry, Pennsylvania had already

13   enacted a rule.  This became an issue of concern in Ohio where it

14   became obvious that there was a request among certain consumers to

15   have access to this information about rbST in milk.  There were

16   also concerns raised with regard to the industry as to what the

17   standards would be.

18        I agree wholeheartedly that ODA has had statutory

19   authority to prohibit misleading statements on labels.  This rule

20   is actually enacted to implement that statutory authority in a

21   area where there is particular need, given market circumstances,

22   to give guidance to the industry about what exactly is permitted

23   with regard to the use of rbST.

24        There were actually extensive hearings, formal and

25   informal, that ODA conducted before this rule was enacted.  Before

1   even the emergency rule was enacted by the governor, the Director

2   of Agriculture appointed an advisory committee that covered a

3   broad spectrum of points of view, including dairy producers,

4   processors, consumers, people involved in organic production

5   across the board.  And the advisory committee held, I believe,

6   three sessions that were open to the public, invited comment and

7   listened to comment from the public, anyone that wished to provide

8   information to the advisory committee, that was conducted before

9   any emergency rule was enacted.

10          Once the emergency rule was enacted, ODA actually

11   conducted two hearings.  There was the initial rule that was filed

12   in February.  A public hearing was held pursuant to Ohio Revised

13   Code 119.  And ODA received many comments from many, many

14   different sectors of the public in response to that rule, both

15   oral comments at the hearing and also written comments that were

16   submitted.

17          Following that hearing, the director decided that a

18   revised rule would be submitted to take into consideration some of

19   the points that were raised in those comments.  So the revised

20   rule was submitted.  Another public hearing was held.  More

21   comments were submitted with regard to that rule.

22          In addition to those formal hearings, if you will, the

23   department has also engaged in informal discussions directly with

24   representatives of the International Dairy Foods Association and

25   the governor's council.  I have also participated in some fairly

1   extensive telephone conversations with the representative of the

2   Organic Trade Association.

3        Finally, the rule, when it came up for consideration

4   before JCARR in the state legislature, it was not under the

5   consent docket.  It was set on the regular docket for comment.

6   And JCARR also heard extensive comments with regard to the rule

7   and ODA's authority to issue this rule in connection with its

8   adoption.

9        THE COURT:  JCARR?

10       MR. PATTERSON:  I'm sorry, the Joint Committee on

11   Administrative Rule Review.  I believe that's what it stands for.

12   That is the legislative committee that reviews every

13   administrative rule to make sure that it's within the authority of

14   the agency to enact it.

15       That process is often done by agreement.  But in this

16   case, because there were individuals that wished to speak to the

17   rule, it was on the full hearing docket.  And the committee heard

18   two or three hours, I believe, of comments.  So there has been an

19   extensive opportunity for public comment throughout this process.

20       JCARR did not see any legal defect with the rule and took

21   no action to hold it up, which is what they would have done if

22   they felt it was not within ODA's jurisdiction to enact it.  So at

23   this time the rule was formally adopted, I believe on May 22; and

24   pursuant to its terms, it would require compliance 120 days

25   thereafter, which would be September 19.

1          The 120 days is actually a figure that was proposed by

2     industry representatives as a reasonable time period for them to

3     have to come into compliance in terms of design changes,

4     production, making all the necessary arrangements to come into

5     compliance with the rule.

6          I would like to respond to one other -- or two other

7     comments that were raised by plaintiffs' counsel, if I could.  One

8     is with regard to actions taken by other states.  Pennsylvania,

9     for example, was a good example of.  Pennsylvania's rule is

10     actually quite similar to Ohio's rule.  It has a few differences.

11     They do not require that the disclaimer language be the same color

12     as the claim; whereas Ohio requires same font size, style and

13     color.  I don't believe Pennsylvania requires color.  Pennsylvania

14     does not require the disclaimer be contiguous, but it must be on

15     the same label and in the same view as the claim.  And I believe

16     Pennsylvania does not require the disclaimer language for

17     certified producers, which may be a meaningful distinction in

18     terms of the OTA case.  I don't know if it's a meaningful

19     distinction with regard to the IDFA case.

20          In other cases states have enacted or in the process of

21     looking at similar regulations.  Kansas, I believe, is currently

22     considering a rule which would be not only as strict but more

23     strict than Ohio's rule, I believe, in that it would require the

24     disclaimer language to be the same font size, not just half the

25     same font as the claim.  I believe Utah, New Jersey and other

1    states are currently looking at the rule.

2          Your Honor, the states are all over the board on this

3    issue, and this may be good policy for the Congress to step in and

4    to explicitly adopt a federal guideline which regulates claims of

5    this type with regard to rbST.  But Congress has chosen not to do

6    that to this point.  And I believe the evidence will demonstrate

7    in this case that OFPA, as I said, does not preempt this issue by

8    the state.

9          So at this point the system that's in place is for each

10   state to make a determination regarding labels for products being

11   offered for sale within that state as to what would be misleading

12   or what is required to do that.

13         I would say, Your Honor, that the intent behind this rule

14   was to try to accommodate the interests of both consumers that

15   wanted to have access to this information and to producers that

16   wanted to make sure that the information was accurate and was not

17   misleading.  So the rule is an attempt to accommodate both of

18   those interests, to give consumers access to accurate information

19   regarding the production of milk.

20         But given the fact that there is no credible scientific

21   evidence that there is any difference between milk produced from

22   rbST-treated cows and cows that have not been treated with rbST,

23   as referenced in the FDA interim guidance, ODA determined that a

24   label without any disclaimer language with regard to rbST does

25   have the potential to mislead consumers if that language is not

1    included.

2         THE COURT:  You have just touched on something that I

3    wondered about as I did my preliminary reading, and that was

4    whether or not the rbST that's given to the cows actually ends up

5    in the milk?

6         MR. PATTERSON:  Your Honor, it is not detectable in any

7    practical way in the testing of the milk.  Cows naturally produce

8    bST, bovine somatotropin.  All milk has hormones in it.  And rbST

9    is a synthetic version of a hormone that is already present in the

10   cows, and that hormone is going to be present in the milk

11   regardless.

12        A few of the members of the advisory committee that I

13   mentioned earlier have scientific credentials from Ohio State, and

14   I can't remember exactly who all was on that committee, but those

15   scientific issues were discussed at some length in the advisory

16   committee, and I believe that there is a consensus that there is

17   no practical means to test milk to detect rbST.

18        I think it's theoretically conceivable to do it if you

19   spend enough money and do mass spectrometry and so forth to

20   distinguish rbST from bST.  There is, I believe, a very slightly

21   altered level of bST and rbST in milk from cows that have been

22   treated with rbST.  The scientific evidence is that it is a

23   statistically insignificant difference in the milk in that it is

24   not possible to distinguish between bST and rbST in any practical

25   way nor that there is any health consequence or health difference

1    whatever.

2          And I appreciate there is some dispute I believe between

3    certain members of the scientific community that, I assume, that

4    the plaintiffs are expecting to testify, having read their

5    pleadings, trying to challenge the FDA's determination that there

6    is no scientific basis to see a difference between the milk, and

7    that may be a factual issue that would have to be presented to

8    this Court.

9          But from what ODA has learned from witnesses in the

10    hearing process and the comment process is that the FDA's

11    determination is correct, that there is no credible scientific

12    evidence there is any difference in the milk.

13          THE COURT:  Thank you.

14          MR. PATTERSON:  If I might, Your Honor, one final

15    comment.  You had asked about -- or actually I think this was a

16    comment made by IDFA's counsel, and that is with regard to

17    Monsanto's involvement.  I simply wanted to clarify.  I think

18    there is a misperception among certain members of the public that

19    Monsanto, who produces really the main, possibly the only, form of

20    rbST that is commercially used, that Monsanto is somehow behind an

21    effort among the states to try to restrict rbST-free claims of

22    milk.  And that's why I tried to take some pains to go through the

23    hearing process that took place to make it clear that the

24    department heard testimony from many different parts of the

25    public.

1      Monsanto did have a representative at one or two of the

2   hearings.  Monsanto did produce comments.  But the Court will not

3   hear any evidence in this case that Monsanto is behind an effort

4   by ODA to adopt this rule or to change the label requirements

5   because no such evidence exists.  And I don't know what efforts

6   Monsanto may have made in terms of lobbying other states in terms

7   of what rules might be appropriate, but there will not be any

8   evidence that Monsanto is in any way pulling any strings or

9   manipulating the regulatory process in Ohio in any respect.

10      THE COURT:  All right.  Thank you, Mr. Patterson.

11      Well, counsel, would either of you like to respond to any

12   of the things that Mr. Patterson just said?

13      MR. ENGLISH:  Your Honor, I would like respond to one

14   issue, and partly because you raised it and partly because of the

15   answer.  Again, IDFA may be different from OTA because the organic

16   foods do have a different point of view on this.  IDFA is on

17   public record as supporting the use of approved technologies.

18   That's not the issue.

19      There may turn out to be some evidence about whether

20   there are tests, how practical they are, how expensive they are.

21   They are -- Apparently, the standard practice to protect

22   intellectual property is to make a deviation in at least one note

23   in the DNA in the product so one can know whether it's being used.

24   But that's not the issue.  I think it is a bit of a red herring.

25      The question here is:  Are IDFA's members free to speak

1   in a manner in which they choose based upon FDA guidance?  And

2   what is not proven, because the director in the First Amendment

3   issues has the burden of proving that it is either factually

4   misleading or potentially misleading, but it may not be based on

5   speculation.

6        The question of whether or not there is an actual

7   difference or health difference is irrelevant if American

8   consumers want the product.  That's what the First Amendment is

9   about.

10       And so we think that is a critical difference, that the

11  consumers have spoken with their wallets --

12       THE COUR:  Even if they want it as a result of some

13  misconception?

14       MR. ENGLISH:  If it's their misconception, that's what

15  our country allows -- our country allows our consumers to have

16  misconceptions.  We have all sorts of products out there locally

17  produced, Ohio produced.  What is the relevance -- Well, a

18  consumer wants to support the Ohio economy.  Consumers don't want

19  their cows treated with rbST for whatever reason consumers want.

20  That's not for the government to say is right or wrong.  That's

21  what the First Amendment is about.

22       I do want to get back to the commerce clause issue for a

23  moment because we are being asked to give up our clients' speech

24  rights not only in Ohio but outside Ohio.  The director had

25  evidence at the hearing presented by IDFA and others, but also

within this documentation now, that there is no way in the modern
distribution system for milk -- to distinguish between milk that
is sold in Pennsylvania or Ohio or Minnesota or anywhere else.
The practical consequence is you either have to give up your
speech as HD Hood did in the sale of their Kemps product here in
Ohio.  Since the rule has been issued, they have stopped selling
specific chocolate milk with that label.  Consumers have lost that
opportunity in Ohio because of the rule.  But anything like
Shamrock or Tillamook from Oregon and Arizona, they don't have
that choice.  They have a national product line.  They have a
national brand.  They are going to have to decide whether they are
going to abide by the Ohio rule and give up their speech rights in
Arizona and in Oregon and in every other state, or what they're
going to do.

And that comes back to the timing issue, and I appreciate
very much the idea of 120 days.  And one of the questions here --
I am confident they can't probably resolve it today -- but we
literally are in a situation where today entities are making
decisions, if you read the declaration from Shamrock and Kraft,
they are already making decisions that are very costly.  The
director pulled a number out of the air, as near as I could tell,
of $250 to $300 for changing a label.  Ben & Jerry's says it is
going to cost $250,000 for them to change all their labels, labels
that have been used in Ohio since 1996, and now they're suddenly
unable to use.  There are some real costs, none of which can be

1    recovered under the Eleventh Amendment, and some real irreparable

2    harm that's going to happen immediately.

3            So we need to schedule --

4            THE COURT:  What have they done in other states that have

5    legislated in this area and required labeling?

6            MR. ENGLISH:  Well, no other state has gone to this

7    point.  This gets to the point that whoever gets this first --

8            THE COURT:  They had to -- I mean if they are selling

9    milk in those states like Pennsylvania, they had to change labels

10   there, didn't they?

11           MR. ENGLISH:  Some labels have been changed in

12   Pennsylvania, to my knowledge, very minimally.  The national label

13   of Shamrock is still being sold in Pennsylvania.  I don't think

14   this has resulted in anything else there.  Illinois has done the

15   same with the national label of Shamrock.  It said, okay, because

16   Arizona worked to develop this label, we are going to allow it,

17   even though under our provision, which is identical to the Ohio

18   rule for no rbST, even though we don't like it, we are going to

19   allow it.  We are not going to interfere with interstate commerce.

20           THE COURT:  Mr. Sunshine, any comments?

21           MR. SUNSHINE:  Lastly, back to preemption for one moment,

22   I want to emphasize there is a certification process under the

23   organic -- the federal organic food act.  In order to be deemed

24   organic, my clients have gone through an extensive process --

25           THE COURT:  Have any courts ruled on the preemption

1 argument in other states where there has been action taken?

2 MR. SUNSHINE: No. The argument that I'm making has not

3 been made. And in fact, there is no case that holds, that we

4 believe we have looked at, and we have got other clients, there is

5 no case that holds that the National Organic Foods Production Act

6 does preempt state rule probably because in the program, the

7 regulations have only been in existence since 2002, this kind of

8 issue hasn't come up.

9 THE COURT: Has there been litigation in the other states

10 that we have been talking about?

11 MR. ENGLISH: There was litigation in Illinois bought by

12 Ben & Jerry's, but it was frontally resolved. Monsanto brought --

13 THE COURT: Any decisions rendered by the courts there?

14 MR. ENGLISH: It was a party decision, jurisdiction over

15 the city officials of Chicago.

16 Similarly, Monsanto sued Oakhurst in federal court in

17 Boston or Maine -- no, the lawsuit was brought in Boston,

18 Massachusetts, and there were two issues raised in the case. The

19 preliminary injunction was denied but not a lengthy decision, just

20 a denial. And then there was a venue question, and that case

21 settled. And as a result of the settlement, Monsanto allowed

22 Oakhurst to continue using the label.

23 THE COURT: No court, state or federal, has ruled on the

24 issue with respect to rbST in any, that you are aware of, any

25 case?

1      MR. ENGLISH:  The *Amestoy* case, the case in Vermont,

2  where it required the processor to speak if their cows -- labels

3  that their cows were treated with rbST.

4      THE COURT:  What happened there?

5      MR. ENGLISH:  Again, the case in Vermont was in two

6  pieces, and the piece that was actually in litigation was a

7  requirement by Vermont that if your cows were -- if your milk was

8  received from cows that were treated with rbST, you had to have a

9  label that said, our milk comes from cows that were treated with

10 rbST.

11     And the IDFA filed a lawsuit.  The district court denied

12 injunctive relief.  The Second Circuit reversed it.  That case had

13 two pieces to it.  It had the First Amendment piece, and it had

14 another piece.  The other piece wasn't ruled on.  It was just the

15 First Amendment.  And the Second Circuit ruled that Vermont had no

16 power to require that speech.

17     But it went beyond, and it was *dicta* -- I think it was a

18 fascinating statement -- we understand consumers want and have a

19 need for this information.  And we respectfully suggest that the

20 manufacturer provide that information voluntarily on labels.  And

21 we encourage consumers to vote with their pocketbooks based on --

22     THE COURT:  Is this Vermont Second Circuit case the

23 only --

24     MR. ENGLISH:  The only decision that I am aware of on the

25 merits, 1996.

1        THE COURT:  Very good.  Well, your comments have been

2   helpful, counsel.

3        Let's talk about what we need to do to get this case

4   ready for a final hearing.  And let's just go around the table

5   again, starting with Mr. English.

6        MR. ENGLISH:  Well, again, Your Honor, the critical point

7   for IDFA -- and I don't want to speak for OTA, but Mr. Sunshine

8   won't disagree with me -- we need something to happen before the

9   September 19 enforcement date, which has been indicated by counsel

10   is not a date that is --

11        THE COURT:  Well, we'll talk about that.  First, I would

12   like to know what the parties think I will need to make a decision

13   either preliminary or final.  And I will tell you this.  I think

14   that I would, if at all possible, like to schedule preparations so

15   the Court only needs to have one hearing in this case.  And it

16   would be my goal to consolidate the hearing on preliminary relief

17   with the hearing on final relief.  What will I need to do that?

18        MR. ENGLISH:  Thank you, Your Honor.  I apologize if I

19   went off.  And by the way, counsel had brief discussions before

20   you arrived, and we may not have covered all the waterfront, but

21   we covered a fair amount of the waterfront.  Leaving aside the

22   timing issue for one moment, we, for our part, may want to take

23   one or two depositions.  We haven't decided that.  We certainly

24   wouldn't make it lengthy.  I think certainly with, the term used

25   was critical decision maker, but probably one or two

1    depositions --

2        THE COURT: These would be officials in the Ohio

3    Department of Agriculture.

4        MR. ENGLISH: Now there was some discussion of witnesses

5    with the department. It may be that as a result of putting forth

6    witnesses that we don't know of yet, that we may have to do

7    something more. But based on what we know about the case today,

8    that would be the situation from our perspective.

9        We believe that beyond that, we have prepared a fairly

10    complete case. Certainly we would like the opportunity to reply

11    to any opposition that was filed. But we believe we have already

12    presented a fairly complete case. This is a facial challenge.

13    And as such, it has a lot of issues that are already out there

14    that don't need to be further resolved.

15        Obviously, the department has a rule making. The

16    transcripts are here. We have 3,000 pages of exhibits that we can

17    get, that we can get to. So there's not a whole lot more.

18        THE COURT: All right. Mr. Sunshine?

19        MR. SUNSHINE: Well, for example, the preemption

20    argument, and that is the one that I have differently from

21    Mr. English, I believe Your Honor could decide that as a legal

22    matter.

23        THE COURT: As a legal matter.

24        MR. SUNSHINE: It really does not involve a tremendous

25    factual workup.

1      THE COURT:  Would either of the plaintiffs expect to call

2  expert witnesses in a final hearing?

3      MR. SUNSHINE:  Perhaps.

4      THE COURT:  How many?  And who?

5      MR. SUNSHINE:  Probably only on the issue -- and I'm

6  speaking a little bit off the top of my head, I haven't given it a

7  lot of thought yet -- but I believe on the consumer issue it is

8  quite possible we would want to put forth an expert on what

9  consumers really do want and really those -- There was a statement

10  made by Mr. Patterson that consumer needs and desires were taken

11  into account.  We may have something to say about that, and we may

12  put an expert in on that.

13      MR. ENGLISH:  I think in addition to that, there may be

14  *amici* filing from consumer groups.  I believe one or more entities

15  will seek the opportunity to file just a brief --

16      THE COURT:  All right.

17      MR. ENGLISH:  -- that could be a result of that.

18      THE COURT:  You don't expect to call any experts, I take

19  it?

20      MR. ENGLISH:  Other than discussed by Mr. Sunshine.

21      THE COURT:  Consumer experts who will say what they think

22  consumers want --

23      MR. ENGLISH:  Correct --

24      THE COURT:  -- based on some kind of research, I suppose,

25  market surveys, whatever.

1          What says the State of Ohio?

2          MR. PATTERSON:  We have been handicapped.  We just got

3     these pleadings yesterday.  So I have not had a chance to discuss

4     this with the director or the dairy division so I will have to

5     shoot from the hip on what we expect we will probably need to do.

6          This case is largely a case of legal disputes.  There

7     will be some extensive legal arguments, I believe, on the First

8     Amendment issue with regard to the *Central Hudson* standards.  I

9     believe there are some extensive legal arguments made with regard

10    to both the preemption issue and with regard to the issue of

11    interstate commerce.

12         I do expect some factual testimony to be required, which

13    may or may not involve experts outside of the Department of

14    Agriculture.  I believe that there probably will be the need for

15    at least one expert witness from outside the department to deal

16    with some of the science issues related to rbST, what it means or

17    doesn't mean in the production of milk and why, from a scientific

18    standpoint, it has the clear potential to mislead consumers.

19         I, frankly, am not able to answer Your Honor what

20    additional expert witnesses may be required.  And I have

21    represented to counsel before we started the formal conference

22    this morning that I would try to notify them as soon as I possibly

23    could who the department would anticipate calling so that if they

24    do wish to take depositions, that can be done in an orderly

25    fashion.

1          THE COURT:  All right.  Do you see the need for any

2     depositions?

3          MR. PATTERSON:  I am not sure, Your Honor.  I believe

4     there may be the need for at least one or two depositions.  There

5     were a number of affidavits filed in support of the motion for

6     preliminary injunction, and I anticipate that it may be necessary

7     to take the depositions of one or more of the individuals that

8     have submitted those declarations.

9          THE COURT:  All right.  Well, as you pointed out, some of

10    these issues -- both sides have pointed out that some of the

11    issues may be purely legal issues.

12          Have you thought about how you will be responding to the

13    complaint?  Do you expect a motion to dismiss?  Will there be a

14    motion for summary judgment?  How can we get these legal issues

15    before the Court in the most efficient manner?

16          Let's go around the table again.  Mr. English?

17          MR. ENGLISH:  Well, we believe they are before the Court

18    in the form of a motion for preliminary injunction.

19          THE COURT:  All right.

20          MR. ENGLISH:  Which under rule 65, as you yourself have

21    indicated, consolidated with a final hearing on the merits, that's

22    where we think the legal issues can be resolved.  We think it is

23    very largely legal.  We think there may be some factual red

24    herrings about what the science is.  We think that's irrelevant.

25    But be that as it may, we think that it's before the Court.

1          THE COURT:  I appreciate that.

2          Mr. Sunshine?

3          MR. SUNSHINE:  I don't disagree at all.  The only thing

4     is, I respect the fact that Mr. Patterson has had a day or even

5     less to review the papers.  I don't think we are taking on the

6     science issue directly as Mr. Patterson seemed to indicate.  I do

7     not believe that this case will involve scientific experts,

8     challenges as to whether or not rbST harms humans or even cows.

9          THE COURT:  I wonder if it might make sense for both

10    sides to consider to what extent stipulations can be made.  That

11    would focus the issues and perhaps even eliminate the need for

12    some of this expert testimony.  Perhaps all of it.  I don't know.

13    It seems that that might be a possibility.

14         Well, as counsel for the state has just pointed out, they

15    have just received the papers.  You folks have been working on

16    this for some time.  This probably didn't come as a complete

17    surprise to them, though?  But they do need time to sort things

18    out.

19         And I'm thinking maybe we ought to have another status

20    conference sometime very soon.  And perhaps then the state will be

21    in a better position to respond to my questions about discovery

22    and experts and so forth.  So let's just look at the calendar and

23    see how we might do that.

24         Mr. Patterson?

25         MR. PATTERSON:  If I might, with regard to the scheduling

1    issue, we have had some informal discussions before we began this

2    morning's conference.  And if I might, just a couple of things.

3    First of all, both plaintiffs' counsel courteously agreed with me

4    to extend a 20-day request for answer deadline to the complaint.

5    Your Honor, at this point I'm not sure whether the department

6    would file any dispositive motions with regard to any of the

7    counts in the complaint.  I think it's possible, but it's too

8    early for me to advise my client that would be an appropriate

9    move.

10         Unfortunately, this being the beginning of July, we have

11   some vacation scheduling issues that I have mentioned to

12   plaintiffs' counsel, most specifically being that I understand

13   Mr. Cole is going to be gone next week.  And, Your Honor, I have

14   had a longstanding family vacation planned from July 14 through

15   the 25th.  So I would respectfully ask if we could stay away from

16   my vacation time in terms of court appointments, I will certainly

17   give this case the highest priority that I can and accommodate the

18   Court's convenience with regard to any conferences and any

19   deadlines that the Court would wish to set on this case.

20         I have also mentioned to plaintiffs' counsel it is not

21   the department's intent to in any way put the plaintiffs in a

22   position where they are dealing with an eleventh-hour ruling with

23   regard to compliance with the rule.  And the September 19 deadline

24   for compliance that came up is based really on just the automatic

25   enforcement of a 120-day deadline in the enforcement of the rule.

1          By the same token, however, I certainly would appreciate

2     an opportunity to review the pleadings in depth and also have

3     in-depth discussions with my client in terms of what their

4     litigation strategy would be.  And I will make every effort to see

5     what we can work out as far as stipulations of facts, as the Court

6     suggested, because I think we may be able to cut back

7     significantly the amount of time that we would take of the Court

8     in hearing on factual issues that may not in fact be the subject

9     of *bona fide* disputes.  So we will make every effort to work out

10    stipulations.

11         THE COURT:  Well, I'm wondering -- I'm looking at the

12    date of July 11 for a possible further status conference with the

13    hope that we might have perhaps an agreed schedule in place by

14    that date.  What do you think, counsel?  Do you think that that

15    will give your enough time to get together, discuss these matters

16    and decide how much time you will need to complete discovery in

17    the case and --

18         MR. PATTERSON:  I will make myself available on the 11th,

19    Your Honor.  The one question that I have, this goes to my point

20    about giving the plaintiffs enough time to prepare, the question

21    was asked of me to raise with my client whether ODA would be

22    willing to consider any sort of postponement of the enforcement

23    deadline of September 19 in this case, which I mentioned to

24    counsel I will certainly discuss with the director.

25         I guess one question that we all had, perhaps, with the

Court would be:  Realistically, what sort of time frame would be
available to the Court both in terms of convening a hearing and
how much time the Court would anticipate it would take to render a
decision in this case?  That would give us a little better idea as
to when we might be able to stipulate to a hearing taking place
before you, Your Honor.

THE COURT:  Well, obviously the sooner we get the
briefing done and the evidence before the Court, the sooner you
can expect a decision.  It's hard for me to predict when we might
be able to decide a case like this.  It's obviously an important
and, perhaps, complicated case.

I think our goal should be to get on track for completing
all the necessary preparation, a briefing schedule, if you will,
and deadline or cutoff date for discovery, a cutoff date for
identifying expert witnesses.  Or if you come to me and say, we
are going to have a stipulation, obviously that would speed things
up.

So I think what I need to do is to give you folks
sufficient time to sit down and see how you want to proceed in
this case and what can you agree to, what can you stipulate, how
many depositions you each want to take and when they can be
scheduled.  And I will put this case on a fast track.  And if we
can get together on July 11 with a reasonable expectation of
having reached decisions about these matters, then I can give you
a date for a hearing in this case.

1    I'm going to be gone for the month of August.  After

2    that, we can schedule a hearing in this case any time in

3    September, October, November or in December.

4         MR. PATTERSON:  Your Honor, I will represent to the Court

5    and to plaintiffs' counsel that I will speak with my client about

6    the issue of entering into a consent decree that would accommodate

7    the Court's schedule and would also give everyone an opportunity

8    to hear this case and in a deliberate fashion without putting the

9    plaintiffs in the position of being out of compliance.

10        So I can't speak for the director, only the director can,

11   I guess, speak for ODA on that issue, but if it would allow this

12   case to be heard in a complete and a deliberative fashion and

13   protect the plaintiffs from being out of compliance with the rule,

14   I think that's worth considering.

15        THE COURT:  I think that is very constructive.

16        MR. ENGLISH:  And I thank you very much for that.  I want

17   to say if we can't do that because of your schedule, we, for our

18   part, because of the reality, these labels don't just magically

19   appear, there is real artwork that has to be done.  That is the

20   reason this cost Ben & Jerry's $250,000.  Some of these labels

21   have to be received from overseas.  So we are literally going to

22   say absent some kind of arrangement after September 19, we would

23   need a decision by August 8.  Obviously, if it doesn't work for

24   your schedule, then we would certainly work with the defendant on

25   this as much as possible.  We really appreciate that, Your Honor,

1  and hopefully we can hear in short order -- it doesn't make a

2  whole lot of sense for these folks spending a lot of money on

3  revised labels when we don't know what the final result is going

4  to be, and they would have to start all over again, and that would

5  be obviously very wasteful of their resources.

6      MR. PATTERSON:  There is nothing magic about September

7  19, Your Honor.

8      THE COURT:  That's very helpful.  But we still need to

9  know how much time will be required to complete whatever discovery

10  will be necessary in this case.  We will need to know how long the

11  hearing may take.  We will need to know what a realistic deadline

12  is for briefing all the legal issues in this case.

13      When I have all of that in hand, then I will be able to

14  say, okay.  We are going to need two days, three days or a week,

15  whatever it may be, for the hearing on this case, and then I can

16  find a time on my calendar when I can fit that in.

17      So is July 11 a realistic date?  Or we can look at some

18  later date.

19      MR. PATTERSON:  Your Honor, I think July 11 is very

20  realistic for us to hopefully agree to the schedule for all the

21  issues that you have raised.

22      MR. ENGLISH:  Yes, thank you, Your Honor.  Yes,

23  absolutely.

24      THE COURT:  I know -- I realize some folks have come

25  quite a distance for this conference, and I appreciate that very

much.  However, if you -- if we should be scheduling things at a time when it's just not convenient to make that trip, then you can certainly request the opportunity to participate by way of telephone, and we will hook up that speaker phone, we will put it in the center of the table, and we can plug you in that way, if you desire.  So -- and I'm not requiring that you be making this trip every time I schedule something here in our courthouse.  You have local counsel, very competent counsel.  And you will also have the opportunity to participate directly through the telephone, if you wish to do so.

MR. SUNSHINE:  Thank you, Your Honor.

MR. ENGLISH:  Thank you, Your Honor.

MR. COLE:  Judge, I just have a comment, since we have 20 plus 20 to respond, there is also the pending motion for preliminary, since they are accommodating, would we need to file a memo contra to --

THE COURT:  No.  No.  You can save your efforts for the briefing on the final hearing.

MR. PATTERSON:  I realize there is one other technical question, I am not sure, but has there been an order actually consolidating the two cases at this point?

THE COURT:  I signed an order yesterday and sent it to Judge Smith's chambers.  We are -- Our chambers conferred, actually through our law clerks, and determined that the cases are essentially identical and the same issues, and mine was filed

1  first.  So under our standard procedure, I will be the presiding

2  judge, and Judge Smith agrees with that, and I assume he will be

3  signing that order today, if he hasn't already signed it.

4          MR. PATTERSON:  Thank you, Your Honor.

5          THE COURT:  Anything else we can do today?

6          MR. ENGLISH:  Not to be hyper technical, and I apologize,

7  but I understand that the goal is not file as a response to the

8  preliminary.  But if it turns out that the director, contrary to

9  what probably would be the September 19 deadline --

10          THE COURT:  That would change things completely.

11          MR. ENGLISH:  I want to be clear --

12          THE COURT:  Then we would have to have a hearing before

13  the 19th, and I would have to arrange my schedule for doing that,

14  and it might require us to have bifurcated proceedings, which we

15  hope we don't.

16          MR. PATTERSON:  I will accurately convey the Court's

17  comments to my client.

18          THE COURT:  All right.  Well, what time do you want to

19  get together on Friday, July 11?  Morning would be best for me.

20          MR. PATTERSON:  I am available.  Whatever is convenient.

21          THE COURT:  Ten o'clock.

22          MR. SUNSHINE:  Ten o'clock is fine by me.

23          MR. PATTERSON:  Would it be in this room as well?

24          THE COURT:  In this room, yes, indeed.

25          Anything else we can do this morning, counsel?

1          MR. PATTERSON:  I think that's everything for us, thank

2     you, Your Honor.

3                              -   -   -

1

C E R T I F I C A T E

2

- - -

3        I, Laura L. Samuels, do hereby certify that the foregoing is

4    a true and correct transcript of the proceedings before the Honorable

5    James L. Graham, Judge, in the United States District Court, Southern

6    District of Ohio, Eastern Division, on the date indicated, reported by

7    me in shorthand and transcribed by me or under my supervision.

8

9

10

11

12                                      /s/Laura L. Samuels
                                        Laura L. Samuels
13                                      Official Federal Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25